UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| DEMETRIA M. SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 3:15-CV-274 JD |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This is a social security appeal. The Claimant, Demetria Smith, applied for social

security disability benefits, but the Social Security Administration denied her application. So,

she filed this action seeking review of the Commissioner's decision. The parties have now

briefed the matter and it is ripe for review. [DE 13, 18, 21]. For the foregoing reasons, the Court

REMANDS this matter to the Commissioner for further proceedings.

## FACTS

Ms. Smith filed for social security disability benefits on October 16, 2012 alleging a

disability onset date of December 1, 2009. Tr. 131, 139. Her claim was denied once initially

and again on reconsideration. Tr. 90, 91. At Ms. Smith's request, Administrative Law Judge

Henry Kramzyk (the ALJ) then held a hearing on October 8, 2013, at which Ms. Smith appeared

*pro se*. Tr. 37.

*1. Ms. Smith's Testimony[1]*

At the hearing, Ms. Smith testified that she is thirty-four years old, married and lives with

her husband. Tr. 44-45. She is unemployed and has not worked since 2005. Tr. 48. She holds a

---

[1] With the ALJ's permission, the Claimant testified in part through her husband. Tr. 44.

bachelor of science degree and began law school in 2005. Tr. 46-47. She did not finish her first semester of law school, though, because she experienced a sudden and severe loss of vision. Tr. 49. That prompted her to consult with several doctors, resulting in her diagnosis with multiple sclerosis (MS) in January 2006. Tr. 49. She obtained treatment for MS through May 2006, though stopped at that time due to the side effects of the medication she was taking and dissatisfaction at her relationship with her neurologist. Tr. 57. In lieu of traditional medical treatment, she turned to prayer, meditation, diet and supplements as a means of controlling MS. Tr. 57. During this time she was mostly homebound and did not do things with family or friends. Tr. 60. She watched TV, listened to audio books, read, prayed and meditated. Tr. 59. She and her husband were married in 2008. Tr. 59. Her condition steadily worsened until October 2012, at which point she restarted treatment. Tr. 58. She has since regained some muscle strength. Tr. 58. She is presently either in bed or a wheelchair at all times. Tr. 59. She cannot write and can only read a little bit at a time due to vision issues. Tr. 47.

Ms. Smith also testified that she had held several jobs prior to the onset of her condition. She worked as a proxy analyst for four months, eight hours per day in 2005. Tr. 50-51. That position primarily involved sedentary computer work. Tr. 51. Prior to that she worked as a research analyst for more than a year investigating health in adolescent women. Tr. 52. That job was partially sedentary, but also involved performing field visits, taking blood samples and carrying approximately twenty pounds on occasion. Tr. 52, 54. Before that she worked as an assistant to students with disabilities. In that role, she worked from 8:00 a.m. to 3:30 p.m., walked from class to class and sat for the majority of the day; she did not need to lift anything. Tr. 54-55. Finally, she worked in another research assistant position, in which she performed

psychological tests on subjects.  That work was largely seated and involved very little lifting or carrying.  Tr. 56.

### 2. *Ms. Smith's Husband's Testimony*

Ms. Smith's husband, Brian Smith, also testified.  He indicated that from December 2009 to December 2010 he and Ms. Smith did not do anything social or fun outside of the home, such as going to the movies, visiting family or friends or taking a vacation.  Tr. 61.  He stated that it took so long for Ms. Smith to seek medical treatment because the couple is "very private" and had hoped that she would get better.  Tr. 62.  As evidence of Ms. Smith's condition, he noted that the couple had submitted receipts from the purchase of medical aides and equipment.  Tr. 62.  The couple also submitted dental records which reflect an incident in which Ms. Smith was trying to walk through their apartment while holding on to furniture to balance and she slipped and fell face first "shatter[ing] her entire teeth."  Tr. 62.

### 3. *Ms. Smith's Mother's Testimony*

Ms. Smith's mother, Cynthia Mitchell, also testified.  She said that from December 2009 to December 2010 she did not do anything social or fun with her daughter.  Tr. 64.  She did attend the Smiths' wedding on June 14, 2008, at which time she noted that Ms. Smith's gait was noticeably impaired.  Tr. 64.  After the wedding, Ms. Mitchell asked to visit the Smiths, but the couple declined her request.  Tr. 64.  She believed this was because they wanted privacy.  Tr. 65.

### 4. *Dr. Toth-Russell's Testimony*

Ms. Smith's neurologist, Dr. Paula Toth-Russell, also testified.  She stated that she had reviewed the medical evidence in the record and opined that Ms. Smith suffers from MS with multiple symptoms including visual disturbance, debilitating tremor, gait disturbance with quadriparesis (muscle weakness affecting all four limbs), significant spasticities and language

3

impairment. Tr. 66. Upon inquiry from the ALJ as to Ms. Smith's condition from December

2009 to December 2010, she testified that she could opine as to Ms. Smith's condition at that

time only through her review of the record and the "known natural history of the disease proper."

Tr. 67. Based upon that, she indicated that Ms. Smith "was neurologically disabled at that time .

. . she would [not] have been able to ambulate effectively [or independently]. Her

communication would have been impaired. She would have been unable to probably sit, stand,

or ambulate" for any amount of time. Tr. 68. Since the ALJ did not ask Dr. Toth-Russell any

other questions, and the Smiths did not have any questions for her, she did not testify further.

  *5. The Vocational Expert's Testimony*

  Vocational expert Carrie Anderson (the VE) also testified at the hearing. She indicated

that Ms. Smith's prior work assisting students with disabilities would be classified as an

intervention specialist position under Dictionary of Occupational Titles (DOT) # 054.107-010,

which was a sedentary position as defined by the DOT and as Ms. Smith performed it. Tr. 70-

71. She further testified that Ms. Smith's three other prior jobs were research analyst positions

under DOT # 199.267-034. Tr. 72. Those positions were also sedentary as defined by the DOT,

though Ms. Smith performed one of them (the job described above in which she collected data

on women's health) at a light level of exertion. Tr. 72.

  The ALJ then provided the VE with a hypothetical. He asked her what job opportunities

would be available for:

> [A] hypothetical claimant of the same age, education, and work experience as the claimant who has the
> ability to lift, carry, push, pull, up to 10 pounds occasionally and lesser weights frequently. Sit for a total of
> up to six hours a day and stand and/or walk for a total of two hours a day. This individual could never
> climb ladders, ropes, or scaffolds, could occasionally climb ramps and stairs. Could occasionally balance,
> stoop, and crouch, but could never kneel or crawl. This hypothetical individual would have to avoid
> moderate exposure to wetness, including wet slippery, uneven surfaces and would have to avoid even
> moderate exposure to hazards such as dangerous machinery and unprotected heights.

Tr. 73-74. The VE responded that such an individual could perform the sedentary work Ms.

Smith previously performed, though not the work that she performed at a light level of exertion.

Tr. 74. Further, the VE said that there are other sedentary jobs such an individual could perform

in the national economy including surveillance monitor (DOT # 379.367-010), order clerk (DOT

# 209.567-014) and toll booth clerk (DOT # 211.462-036). Tr. 74-75. The VE also indicated

that a hypothetical individual with the above-described limitations could not work in the national

economy if she "could not maintain regular attendance and be punctual within customary

tolerances" and "perform work activities within a schedule." Tr. 75. The VE indicated that her

testimony was consistent with the DOT, except for the information regarding work available for

an absent or off task individual, which came solely from her twelve years of experience in the

field. Tr. 75.

Ms. Smith's husband also posed questions to the VE. He asked whether a toll both clerk

would be required to control her arms in a reasonable manner and see well enough to identify

currency denominations. Tr. 76. The VE responded that those were essential attributes of a toll

booth clerk. Tr. 76. Mr. Smith replied that Ms. Smith did not possess those capabilities as of the

alleged date of onset. Tr. 76. Mr. Smith further indicated that Ms. Smith would be unable to

drive to work due to her vision impairment. Tr. 76-77. Finally, he asked the VE whether all of

the jobs the VE discussed would require the employee to write and do some degree of computer

work. The VE replied that they did. Mr. Smith then stated that Ms. Smith had been unable to do

those things since 2009 or earlier. Tr. 77.

*6. The Medical Evidence*

Prior to issuing an opinion, the ALJ considered the medical evidence. It shows that Ms. Smith sought medical care after a sudden deterioration of her vision in November 2005. Tr. 239. She met with neurologist Dr. Ari Green in December 2005, who ordered several diagnostic tests. Tr. 241-242. In January 2006 he reviewed the results of those tests, including a spinal MRI, and diagnosed Ms. Smith with MS. Tr. 237. In February 2007, Ms. Smith returned to Dr. Green, who initiated treatment with a medication called Rebif. Tr. 235. Ms. Smith saw Dr. Green again in May 2006. She reported minor side effects from the medication including muscle aches and "very mild injection site reactions." Tr. 232. She indicated that she believed her vision had worsened and that she did not drive, though that her reading had improved to the point she could read short print articles. Tr. 232. Ms. Smith sought no further treatment until 2012.

In October 2012, she was admitted to St. Joseph Hospital "under great duress, at the insistence of her husband, EMTs, and the police and fire department." Tr. 249. At that time she was essentially bedridden with severe neurologic impairment and exhibited numerous symptoms including ataxia (a lack of muscle control during voluntary movements), spastic quadriparesis, dysarthria (unclear speech) and bowel and bladder incontinence. Tr. 244, 255. Her husband indicated that she had been wheelchair-bound since 2010 and dependent on him for all activities of daily living. Tr. 249, 251. After reviewing the results of an MRI, neurologist Dr. Toth-Russell confirmed that Ms. Smith suffered from "severe multiple sclerosis." Tr. 244. Ms. Smith was transferred from the hospital into an inpatient rehabilitation facility on October 12, 2012 and remained there until her discharge in December 14, 2012. Tr. 281.

While Ms. Smith does not have any medical records from May 2006 to October 2012, her two treating physicians have opined on her probable condition at that time. First, Dr. Todd

Graham said that Ms. Smith is "severely disabled and has been disabled and unable to provide and perform self care or mobility skills for more than 2 years. She has been at wheelchair level for more than 3 years and has required assistance even to propel the wheelchair for more than 2 years." Tr. 275. Dr. Toth-Russell indicated that "by 2010 [Ms. Smith] unfortunately suffered from progressive debilitating neurological symptoms which rendered her wheelchair bound and completely disabled. Since December of 2010, [Ms. Smith] has required total care due to severe ataxia, weakness, dysarthria, and dysphagia. She requires help in all activities of daily living including bathing, dressing, feeding, turning, and toileting. She has been totally disabled in this manner since on or before December of 2010." Tr. 276.

Two agency doctors also examined Ms. Smith's medical records. Their opinions are extremely limited; both conclude only that there is "insufficient evidence" to evaluate Ms. Smith's claim and thus deem her not disabled as of the alleged onset date. Tr. 82-83, 88.

*7. The ALJ's Decision*

After reviewing this medical evidence and hearing testimony, the ALJ issued a written opinion which upheld the decision to deny Ms. Smith benefits. The ALJ found that Ms. Smith met insured status requirements through December 31, 2010 and had not engaged in substantial gainful activity since her alleged onset date. Tr. 19. He further found that Ms. Smith was severely impaired by multiple sclerosis, though concluded that Ms. Smith's MS did not meet or equal the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpt. P, Appendix 1. Tr. 19-20. He then evaluated Ms. Smith's residual functional capacity (RFC) and found that, through the date last insured, Ms. Smith was able to:

> Perform sedentary work as defined in 20 CFR 404.1567(a) except lift 10 pounds occasionally and lesser weights frequently; sit for a total of up to 6 hours a day and stand and/or walk for a total of 2 hours a day; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, or crouch; never kneel or crawl; avoid even moderate exposure to

wetness including wet, slippery, uneven surfaces; and avoid even moderate exposure to hazards
such as unprotected heights and dangerous machinery.

Tr. 20. In arriving at this RFC, the ALJ assigned "no weight" to the opinions of Drs. Graham

and Toth-Russell. Tr. 26. Since those doctors did not treat Ms. Smith at the alleged date of

onset, he believed their opinions to be "speculative" and "necessarily reliant on subjective

reports." Tr. 26. It is unclear how much weight the ALJ assigned to the agency doctors'

opinions. He simply noted that they were "consistent with the lack of medical evidence," though

found Ms. Smith's condition to be severe in contrast to the agency doctors' findings that there

was insufficient medical evidence to determine severity. Tr. 26. The ALJ also found the

Smiths' allegations regarding the severity of Ms. Smith's symptoms from December 1, 2009 to

December 31, 2010 to be only partially credible. Tr. 24. He then determined that Ms. Smith

could perform her past work as a research analyst, as performed at a sedentary level, and as an

intervention specialist. Tr. 26. Alternatively he concluded that Ms. Smith was capable of

performing other sedentary work that existed in the national economy. Tr. 27-28. Thus, the ALJ

determined that Ms. Smith was not disabled as of her alleged onset date. Tr. 28. The Appeals

Council denied Ms. Smith's request for review of that decision, thereby making it the final

determination of the Commissioner. 20 C.F.R. § 404.981; *Schomas v. Colvin*, 732 F.3d 702, 707

(7th Cir. 2013).

## STANDARD OF REVIEW

The Court will affirm the Commissioner's denial of disability benefits if it is supported

by substantial evidence. *Craft v. Astrue,* 539 F.3d 668, 673 (7th Cir. 2008). Substantial

evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). It must be "more than

a scintilla but may be less than a preponderance." *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir.

2007).  Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court will affirm the Commissioner's decision as long as it is adequately supported.  *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the Court does not reweigh evidence, resolve conflicts, decide questions of credibility or substitute the Court's own judgment for that of the Commissioner.  *Lopez ex rel. Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003).  The Court does, however, critically review the record to ensure that the ALJ's decision is supported by the evidence and contains an adequate discussion of the issues.  *Id.*  The ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection; he may not ignore an entire line of evidence that is contrary to his findings.  *Zurawski v. Halter,* 245 F.3d 881, 887 (7th Cir. 2001).  The ALJ must also "articulate at some minimal level his analysis of the evidence" to permit informed review.  *Id.*  Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, he must provide a "logical bridge" between the evidence and his conclusions.  *Terry v. Astrue,* 580 F.3d 471, 475 (7th Cir. 2009).  Furthermore, conclusions of law are not entitled to deference.  So, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of his factual findings.  *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir. 1997).

## ANALYSIS

Disability benefits are available only to individuals who are disabled under the terms of the Social Security Act.  *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998).  A claimant is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

9

months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations contain a five-step test to ascertain whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4). These steps require the Court to sequentially determine:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment;

3. Whether the claimant's impairment meets or equals one listed in the regulations;

4. Whether the claimant can still perform relevant past work; and

5. Whether the claimant can perform other work in the community.

20 C.F.R. § 404.1520(a)(4); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, the Commissioner acknowledges disability. 20 C.F.R. § 404.1520(a)(4)(iii). However, if a listing is not met or equaled, the ALJ must assess the claimant's residual functional capacity between steps three and four. The RFC is then used to determine whether the claimant can perform past work under step four and whether the claimant can perform other work in society at step five. 20 C.F.R. § 404.1520(e). The claimant has the burden of proof in steps one through four, while the burden shifts to the Commissioner at step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Ms. Smith argues that the ALJ erred in conducting this analysis in four respects. First, she says that the ALJ failed to comply with Social Security Ruling 83-20. Second, she says that the ALJ impermissibly "played doctor" in making lay judgments about the progression of her MS to determine her RFC. Third, she says that the ALJ erred in evaluating the credibility of her

10

and her husband.  Fourth, she says that the ALJ did not fulfill his obligation to adequately develop the record.

 1. *SSR 83-20*

 The Court first addresses the application of SSR 83-20.  That social security regulation provides the analytical framework for determining an onset date where a claimant is disabled but it is unclear when her disability began.  Smith argues that the ALJ failed to comply with SSR 83-20 when he gave the opinions of treating physicians Drs. Toth-Russell and Graham no weight and failed to appoint a medical advisor.  The Commissioner responds that SSR 83-20 is inapplicable since the ALJ never made a finding of disability.  Further, the Commissioner says that the ALJ nevertheless complied with SSR 83-20 by permissibly weighing all evidence in the record.

 The Court first addresses the applicability of SSR 83-20.  The Commissioner relies on *Scheck v. Barnhart* for the proposition that SSR 83-20 is inapplicable absent a finding of disability.  357 F.3d 697 (7th Cir. 2004).  In that case, the Seventh Circuit found SSR 83-20 to be irrelevant since the ALJ had found that the evidence demonstrated that the claimant could perform his past work.  *Id.* at 701.  Other cases have also recognized that determining an onset date doesn't make sense where there is no evidence of disability to begin with.  *Eichstadt v. Astrue*, 534 F.3d 663, 667 (7th Cir. 2008) (finding that it was unnecessary for the ALJ to seek the input of a medical advisor where "there simply [was] not enough evidence to support even an inference of an onset date that is now more than two decades in the past."); *Guranovich v. Astrue*, 465 F. App'x 541, 544 (7th Cir. 2012) ("But because the ALJ did not find that Guranovich was presently disabled, he did not need to follow SSR 83–20"); *see also Parker v. Astrue*, 597 F.3d 920, 925 (7th Cir. 2010) (noting that in some cases it is permissible for the ALJ

to forgo retaining a medical expert and determine directly whether the plaintiff was disabled as of the alleged onset date).

But this case is not like *Scheck* and its progeny. Here the ALJ did not find that Ms. Smith is not currently disabled and there is not unequivocal evidence that she was capable of working at the time of her alleged onset date. Moreover, Ms. Smith says that it is indisputable that she is now disabled and that position is both supported by the record, *see, e.g.*, tr. 275-76, 427, 433, 448, and uncontested by the Commissioner. In these circumstances, where the evidence is at very least "ambiguous" regarding the possibility that "the onset of [the claimant's] disability occurred before the expiration of her insured status," the ALJ should turn to SSR 83-20 to make the necessary retroactive findings. *Grebenick v. Chater*, 121 F.3d 1193, 1201 (8th Cir. 1997); *Parker*, 597 F.3d at 925 (citing *Grebenick* with approval); *see also Gutka v. Apfel*, 54 F. Supp. 2d 783, 787–88 (N.D. Ill. 1999) (finding that, even though the ALJ did not expressly find the claimant disabled, he should have followed procedures set forth in SSR 83-20 in light of an uncontroverted physician's opinion that the claimant was disabled); *Campbell v. Chater*, 932 F. Supp. 1072, 1075-78 (N.D. Ill. 1996) (rejecting the Commissioner's argument that a "formal finding of disability" is necessary to invoke SSR 83-20 as "distressingly myopic").

Under SSR 83-20 the ALJ must consider the applicant's allegations, the applicant's work history and the medical evidence in determining a disability onset date. Of these factors, the medical evidence "is the most important factor, and the chosen onset date must be consistent with it." *Henderson ex rel. Henderson v. Apfel*, 179 F.3d 507, 513 (7th Cir. 1999). In this case two doctors, Drs. Graham and Toth-Russell, gave substantive opinions on Ms. Smith's condition. Both believed that Ms. Smith was severely incapacitated as of December 2010. *See, e.g.*, tr. 276, 437 (Dr. Toth-Russell: Ms. Smith "requires help in all activities of daily living including bathing,

dressing, feeding, turning and toileting" and her severe disability dates to "at least 2006 or 2007, and without question by December of 2009"); tr. 275 (Dr. Graham: Ms. Smith has "required assistance even to propel [her] wheelchair" for more than two years prior to October 2012). Dr. Toth-Russell further testified in support of her findings at the hearing. Tr. 66-69 (noting, among other things, that Ms. Smith was unable to sit, stand or walk for any amount of time as of December 2010). The ALJ did not put much stake in these opinions. Rather, he noted that neither Dr. Graham nor Dr. Toth-Russell treated Ms. Smith prior to 2012 and thus rejected their conclusions as speculative and "necessarily reliant on subjective reports." Tr. 26.[2]

Once he did that, he should have called a medical advisor. SSR 83-20 instructs that an ALJ should call a medical advisor unless "the medical record is complete enough to unambiguously fix the correct onset date." *Canen v. Comm'r of Soc. Sec.*, No. 4:13-CV-2, 2013 WL 5966463, at *4 (N.D. Ind. Nov. 8, 2013); *accord Payne v. Colvin*, No. 3:12-CV-00675, 2014 WL 1031017, at *5 (N.D. Ind. Mar. 13, 2014); *Lichter v. Bowen*, 814 F.2d 430, 434-35 (7th Cir. 1987). Here, after the ALJ afforded "no weight" to the opinions of Drs. Graham and Toth-Russell, there was no medical evidence left in the record that spoke to Ms. Smith's condition as of December 2010. Thus, far from being "complete," the medical record was markedly deficient. A medical advisor would have helped fill that gap by providing information as to what

---

[2] This assessment of the opinions of Ms. Smith's treating physicians was not adequate. If an ALJ determines under 20 C.F.R. § 404.1527(c)(2) that a treating physician's opinion is not due controlling weight he "is not permitted simply to discard it." *Scrogham v. Colvin*, 765 F.3d 685, 697 (7th Cir. 2014). Rather, he is required to consider the factors set forth in 20 C.F.R. § 404.1527 to determine how much weight it is due. *Id*. (noting that the ALJ should consider (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) supportability, (4) consistency with the record as a whole and (5) whether the treating physician was a specialist in the relevant area). The ALJ made no attempt to address these factors, but rather simply afforded the treating physicians' opinions "no weight." Tr. 26. This is particularly perplexing since, given the lack of medical records from May 2006 to October 2012, the retrospective opinions of Drs. Toth-Russell and Graham are the only medical evidence in the record as to Ms. Smith's condition on her alleged onset date. On remand, the ALJ should determine if these opinions are entitled to controlling weight under 20 C.F.R. § 404.1527(c)(2). If he determines that they are not, he should follow the analysis set forth in 20 C.F.R. § 404.1527 to determine what weight they are due.

inferences could be drawn from the records available as to Ms. Smith's condition on the alleged onset date.

The ALJ also erred in reaching a conclusion that was inconsistent with the medical evidence. Under SSR 83-20 the onset date chosen "can never be inconsistent with the medical evidence of record." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 353 (7th Cir. 2005) (quoting SSR 83-20). Here, the ALJ's conclusion that Ms. Smith was not disabled as of December 2010 contradicted the opinions of Drs. Graham and Toth-Russell, which constituted the only medical evidence in the record as to Ms. Smith's condition at that time. It bears noting that those opinions did not bind the ALJ to a finding of disability. But SSR 83-20 did require the ALJ to either find them rooted in a legitimate medical basis and credit them, or to further develop the medical evidence to determine if a contrary conclusion was appropriate. Here, where he did neither, he committed reversible error.

*2. The RFC*

That raises a related problem with the ALJ's opinion: since he rejected the only relevant medical evidence in the record, it is entirely unclear how he arrived at Ms. Smith's RFC. While the claimant's RFC is a legal determination reserved for the ALJ, it must be supported by an "adequate evidentiary basis." *Newell v. Astrue*, 869 F. Supp. 2d 875, 891 (N.D. Ill. 2012). The ALJ determined that Ms. Smith could, among other things "occasionally climb ramps and stairs," "sit for a total of up to 6 hours a day," "stand and/or walk for a total of 2 hours a day" and "occasionally balance, stoop, or crouch." The basis for these conclusions is wholly inapparent.

The Commissioner first points to the agency doctors' opinions. But it is difficult to see how the ALJ could have relied on those for anything. Neither contains an RFC determination or any other substantive information. Rather, both reach the cursory conclusion that there is

14

"insufficient evidence" to evaluate Ms. Smith's claim. Tr. 82, 88. Moreover, even if those opinions had provided a basis for determining Ms. Smith's capabilities as of December 2010, the ALJ failed to explain what weight, if any, he assigned to them. *See* 20 C.F.R. § 404.1527 ("Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant").

The Commissioner also points to a variety of other evidence, but none of it sheds light on Ms. Smith's condition as of December 2010 either. Much of it goes to credibility. *See* tr. 24-25 (noting that receipts reflect the purchase of a walker and retention of home health aides in December 2010 and the purchase of a wheelchair in February 2011, contrary to claimant's husband's claims that these events each occurred one year earlier); tr. 24 (noting that Ms. Smith reported discontinuing treatment in May 2006 due to medication side effects, despite medical records from that time indicating that her side effects were mild). This could provide reason to believe that Ms. Smith's capabilities weren't what she said they were, but it does not provide a basis for concluding what the ALJ actually believed them to be. The ALJ also noted that Ms. Smith did not seek medical treatment from 2006 – 2012, though that does not speak to what she could do as of 2010 either, whether with or without treatment. Tr. 24. The remaining evidence cited by the ALJ is years removed from 2010 and provides no sound information as to what Ms. Smith could do in the course of a forty-hour work week at that time. Tr. 25 (noting that the claimant's condition began to deteriorate particularly rapidly in 2012); tr. 26 (noting that the claimant's mother testified that Ms. Smith could walk as of 2008).

So, the ALJ discredited Ms. Smith's treating physicians, placed uncertain weight on two cursory agency doctor opinions and cited evidence that provides no indication of Ms. Smith's

15

vocational capacity as of December 2010. It is thus entirely unclear how he concluded that Ms.

Smith could do things like walk for two hours per day and occasionally climb stairs at that time.

By failing to provide a sound basis for his RFC conclusion, and instead relying on his own

speculation, the ALJ impermissibly "played doctor." *Bailey v. Barnhart*, 473 F. Supp. 2d 822,

839 (N.D. Ill. 2006). Further, while the ALJ perhaps found the evidence to indicate that Ms.

Smith was capable as of 2006 and incapacitated as of 2012 and thus surmised that her condition

lay somewhere in between as of 2010, that too amounts to impermissible conjecture. *See Suide*

*v. Astrue*, 371 F. App'x 684, 690 (7th Cir. 2010) (the ALJ may not "play doctor" by using her

own lay opinions to fill evidentiary gaps in the record); *see also Bailey*, 473 F. Supp. 2d at 838

(the ALJ may not discard the RFCs in the record and instead construct his own "middle ground"

RFC assessment). As numerous cases make clear, the ALJ's failure to provide a legitimate basis

for his RFC finding requires reversal. *See Briscoe*, 425 F.3d at 352 (reversal required where the

ALJ did not provide "a narrative discussion describing how the evidence supports each

conclusion [in the RFC], citing specific medical facts" as required by SSR 96-8p); *Norris v.*

*Astrue*, 776 F. Supp. 2d 616, 638 (N.D. Ill. 2011) (remand warranted where, after discrediting

the claimant's primary care physician and the agency doctors, the ALJ failed to call a medical

expert or explain what other medical basis she relied on in making the claimant's RFC

determination); *Kelly v. Colvin*, No. 14 C 1086, 2015 WL 4730119, at *8 (N.D. Ill. Aug. 10,

2015) ("[A]n ALJ must always explain in some minimal form how the record relates to his

conclusions about what a claimant can do during an ordinary workday.").

    *3. Remaining Arguments*

    While the ALJ's noncompliance with SSR 83-20 and failure to provide an adequate basis

for his RFC determination provide two separate bases for remand, the Court nevertheless briefly

addresses Ms. Smith's remaining arguments to guide the ALJ's further treatment of this matter.

First, Ms. Smith argues that the ALJ did not properly evaluate her and her husband's credibility. She says that the ALJ impermissibly faulted the Smiths for reporting that they purchased a walker and a wheelchair a year earlier than receipts indicate that they did, thus emphasizing a glitch in memory over the substance of their testimony. The Commissioner responds that this was one legitimate reason out of several provided by the ALJ for discounting their testimony.

While the Smiths fault the ALJ for discrediting their testimony based on discrepancies between dates that they provided and receipts from the purchase of assistive devices, it is both permissible and logical to discount testimony on the basis that it is inconsistent with other evidence in the record.[3] *Mueller v. Astrue*, 860 F. Supp. 2d 615, 635 (N.D. Ill. 2012), *aff'd sub nom. Mueller v. Colvin*, 524 F. App'x 282 (7th Cir. 2013) ("SSR 96–7p, advises, perhaps obviously, that '[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record.'") (alteration in original); *see also Michalec v. Colvin*, No. 15-1825, 2015 WL 8526359, at *4 (7th Cir. Dec. 10, 2015) ("In light of the inconsistencies between Michalec's statements to his doctors and his testimony at the hearing, Michalec has not shown that the ALJ's credibility assessment is patently erroneous."). Further, as the Commissioner points out, the ALJ also provided other reasons to discredit the Smiths' testimony. Specifically, the couple indicated that Ms. Smith ceased medical treatment in May 2006 in part due to side effects, though contemporaneous

---

[3] In attacking the ALJ's credibility assessment, Ms. Smith also says that the ALJ erred by "ignor[ing] [an] entire line of evidence" in disregarding the Smiths' purchase of assistive devices, regardless of whether that happened when the Smiths said it did or a year later. [DE 13 at 25]. That raises a potential error in the ALJ's opinion independent of the credibility assessment. But, to the extent Ms. Smith considers this an independent basis for reversal, the Court does not address it, since the Court finds reversal warranted on other grounds as set forth above.

medical records indicate that she was experiencing minimal side effects. Tr. 24. And Mr. Smith

said that the couple hired home health aides a year earlier than records show they did. Tr. 25.

That said, the ALJ also cited some evidence in his credibility assessment that raises

concerns. First, he noted that Ms. Smith got married, moved and took a vacation, though failed

to explain how these activities are inconsistent with her alleged impairments. *See Murphy*, 759

F.3d at 817 (finding credibility determination not supported by substantial evidence where the

ALJ noted that the claimant had gone on vacation but failed to indicate "how going on vacation

was inconsistent with [the claimant's] claimed degree of physical limitation"). Second, he

assigned some probative value to Ms. Smith's failure to seek medical treatment[4] from 2006 to

2012 without evaluating the couple's explanation that this occurred because they are "very

private." That explanation deserved some consideration, particularly because it was supported

by the testimony of Ms. Smith's mother and hospital records indicating that Ms. Smith's

eventual hospital visit occurred "under great duress." *See Craft*, 539 F.3d at 679 (providing that

ALJs should explore the claimant's explanations for a failure to seek medical care prior to

drawing inferences from it). Third, the ALJ noted that, while Mr. Smith stressed Ms. Smith's

dental treatment in 2008 as evidence of her poor condition, Ms. Smith's dental records show

only a chipped tooth and that she was not on any prescription medication. But that is dubiously

probative, since the point of Mr. Smith's testimony was that Ms. Smith was so incapacitated she

could not safely walk, not that she suffered severe dental damage (though perhaps Mr. Smith's

---

[4] Contrary to Ms. Smith's argument that treatment for MS is largely futile, the Commissioner cites evidence
indicating that Ms. Smith's condition improved when she sought medical care. *See* tr. 314, 332. Accordingly, Ms.
Smith's failure to seek treatment could be relevant to assessing her credibility (subject to an evaluation of the
privacy rationale she advanced for not doing so). The Court need not address whether treatment could have directly
affected Ms. Smith's disability status as of December 2010, however, since as the Commissioner acknowledges "the
ALJ actually never stated that the Plaintiff would have improved and been able to work had she been compliant"
with treatment. [DE 18 at 16].

description of this incident as Ms. Smith "shatter[ing] her entire teeth" indicates some propensity to exaggerate). Tr. 62. Finally, the ALJ noted Ms. Smith's statements that her condition only gradually got worse until 2012, at which point it deteriorated much more quickly. That observation about the rate of onset of Ms. Smith's symptoms, however, says nothing about her actual condition as of December 2010. It is thus unclear how it would detract from her credibility. Indeed, if anything, that Ms. Smith's condition began to slowly worsen as of 2006 would seem to support her assertion that her abilities were severely limited by late 2010. Thus, while the ALJ did provide some legitimate justifications for his credibility assessment, he also provided some dubious ones that he should revisit on remand.

Lastly, Ms. Smith argues that the ALJ failed to sufficiently develop the record. In conducting the hearing, the ALJ should have been cognizant of his obligation to develop a full and fair record, which was heightened since Ms. Smith appeared without counsel. *See Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). Consistent with the above analysis, however, this matter will be remanded for further proceedings in which the Court has indicated that the ALJ should call a medical advisor and further develop the medical evidence to the extent he questions the opinions of Drs. Graham and Toth-Russell. That will result in a more fully developed record. It is possible that this will also provide sufficient evidence to assess Ms. Smith's claim. But, to the extent any evidentiary holes do remain, the ALJ should remain aware of his "duty to develop a full and fair record." *Dunn v. Colvin*, No. 3:14-CV-1974, 2016 WL 403923, at *5 (N.D. Ind. Feb. 2, 2016) (citing *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000)). That is especially true if Ms. Smith reverts to *pro se* status. *See Nelms*, 553 F.3d at 1098.

19

**CONCLUSION**

For the foregoing reasons, the decision of the Commissioner denying Ms. Smith's

claim for benefits is **REVERSED**, and this matter is **REMANDED** to the Commissioner for

further proceedings consistent with this opinion.

SO ORDERED.

ENTERED:  September 21, 2016

                                                        /s/ JON E. DEGUILIO
                                                Judge
                                                United States District Court